Jose **VENZOR**, Plaintiff,

v.

Julio Cesar Chavez **GONZALEZ**, a/k/a, Julio Cesar Chavez, Don King Productions, Inc., Don King, Al Braverman, and Craig Houk, Defendants.

No. 96 C 413.

United States District Court,
N.D. Illinois,
Eastern Division.

July 3, 1996.

Robert Orman, Anne I–Pin Shaw, Robert Orman & Associates, and Jeffrey Wayne Finke, Raleigh and Helms, Chicago, IL, for plaintiff.

Alan Francis Curley, Susan Valentine, C. Philip Curley, Robinson, Curley & Clayton, P.C., Gerald G. Saltarelli, and James A. Morsch, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Chicago BlackHawk hockey fans at the United Center in downtown Chicago are accustomed to watching minimally talented amateur fisticuffs of short duration. On July

29, 1995, however, the United Center hosted a professional boxing match between Julio Cesar Chavez and Craig Houk which lasted for a shorter period of time than the typical hockey fight. Approximately ninety-six seconds into the first round, Chavez knocked out Houk. According to the plaintiff, who was the fight's promoter, the quick victory was foreordained; Houk took a dive. Jose Venzor brings this action, removed from state court, against Defendants Chavez, Houk, Don King Productions, Don King, and Al Braverman. The seven-count complaint seeks recovery under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and under various state law theories. Presently before us are motions to dismiss filed by (1) Julio Cesar Chavez, (2) Don King Productions, and (3) Don King and Al Braverman. For the reasons set forth below, we grant in part and deny in part the motions.

## I. Background

According to the complaint, in March 1993 Chavez agreed to fight a June 1993 match in the Chicago area. However, King Productions owned the exclusive right to promote Chavez's fights, and Chavez had failed to obtain a waiver from King Productions before agreeing to the June fight. Venzor, an investor in the June fight, sued Chavez and others in state court to recover his investment. Eventually, Venzor and King began negotiating a settlement, and in February 1995, King Productions' counsel faxed a letter to Venzor's lawyer that generally spelled out the basis for a settlement. Compl. ¶ 10, Ex. B. According to the fax, King agreed to release Chavez from the exclusivity contract for one non-championship fight in Chicago in exchange for Venzor's dismissal of the suit. Id., Ex. B.

On April 20, 1995, the plaintiff met with King in Florida. Id. ¶ 11. King told Venzor that Houk would be Chavez's opponent in the non-title fight. Houk, according to King, "would put up a 'great fight'" and "be a serious and competitive opponent" against Chavez. Id. After the meeting, King Productions' counsel faxed a draft settlement agreement and two subsequent revisions on, respectively, April 25, May 11, and June 28.

Id., Exs. C, D, E. The June draft released Chavez to fight in exchange for, among other things, $50,000 to King Productions, a $250,-000 purse for Chavez, and a $50,000 purse for Houk. In addition, the May and June drafts named Houk as the opponent.

However, Venzor substituted another boxer's name for Houk's, signed the agreement, and faxed the agreement to Chavez, who then signed and returned the agreement to Venzor by fax. Id. ¶ 16, Ex. F. Later, King called Venzor and insisted that "Chavez would fight nobody but ... Houk." Id. It was not until early July 1995, the plaintiff alleges, that Houk learned that he was Chavez's opponent. Braverman phoned Houk and "instructed ... Houk to go down and to make [Venzor] look bad in doing so." Id. ¶ 17. King Productions promised to pay $10,000 for Houk to throw the fight, and Houk accepted. Id. According to the plaintiff, "[a]s of the date of this phone call, all of the defendants were in agreement that defendant Houk would lose his fight with defendant Chavez." Id.

As the date of the fight—July 29th—approached, King again told Venzor that only Houk would fight Chavez. Id. ¶ 18. Assured of victory, Chavez allegedly failed, starting on July 15, to properly train for the fight; "[h]e consumed substances which were deleterious to his body and which would have otherwise put him at risk in any honest fight at the professional level." Id. ¶ 19. In addition, Chavez "got into at least one bar room fight" and was absent (or tardy) at important meetings, press conferences, and publicity events. Id. Meanwhile, King Productions sent a final fax to Venzor on July 25, confirming the undercard fight and reminding Venzor of his responsibility to pay for Houk's room and dining expenses while in Chicago. Id., Ex. G.

The fight lasted ninety-six seconds; Chavez won by knockout. According to the plaintiff, King Productions and King took possession of the fight's videotapes immediately after the fight ended, and the match was not, contrary to custom, replayed on the United Center's video screens. Id. ¶ 22. However, Venzor obtained an unauthorized videotape of the fight, and claims it shows

that the supposed knockout punch, "if contact was made at all, was nothing more than a glancing blow." *Id.* ¶ 23. Houk "jumped backwards in reaction to the 'knockout' punch and thereafter sat on the ring in the corner until the fight was over." *Id.*

In addition to the allegations regarding the Chavez–Houk fight, the plaintiff charges that King, King Productions, and Braverman used Houk twice before to throw fights. On January 29, 1994, Houk intentionally lost a match against Meldrick Taylor, a boxer under contract to King Productions, after Houk received a bribe; Taylor " 'needed a win' " because of an upcoming fight between Taylor and Chavez. *Id.* ¶ 12(a). Also, on September 4, 1994, Houk purposefully lost a fight against Gary Murray, another King Productions boxer. *Id.* ¶ 12(b).

Based on these allegations, the complaint asserts seven counts: (1) King Productions, King, and Braverman violated 18 U.S.C. § 1962(a), by receiving income from a pattern of racketeering activity and investing or using that income in the establishment or operation of an enterprise, King Productions; (2) King, King Productions, Braverman, Chavez, and Houk violated § 1962(b) by acquiring or maintaining an interest in or control of an enterprise through a pattern of racketeering activity; (3) King, Chavez, Braverman, and Houk violated § 1962(c) by conducting or participating in the conduct of King Productions' affairs through a pattern of racketeering activity; (4) the defendants violated § 1962(d) by conspiring to violate § 1962(a), (b), and (c); (5) King and King Productions committed promissory fraud by misrepresenting that Houk would be a serious and competitive opponent; (6) Chavez breached an agreement to promote the fight; and (7) the defendants violated the Illinois Professional Boxing and Wrestling Act, 225 ILCS 105/1–26. The defendants move to dismiss, and we now turn to their arguments.

## II. Standard for Reviewing Motions to Dismiss

■ A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–

46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995); *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir. 1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). We take as true the well-pleaded factual allegations of the complaint and view them, as well as reasonable inferences drawn from them, in the light most favorable to the plaintiff. *Cornfield v. Consolidated High Sch. Dist. 230,* 991 F.2d 1316, 1324 (7th Cir.1993) (citing *Ellsworth,* 774 F.2d at 184). In addition, we consider exhibits incorporated into the complaint, *Webster v. New Lenox Sch. Dist. 122,* 917 F.2d 1004, 1005 (7th Cir.1990), as allegations in the complaint.

## III. Discussion

### A. Particularity of Fraud Allegations

■ Initially, the defendants argue that the allegations of fraud fail to satisfy Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud ... shall be stated with particularity." This particularity requirement attempts to serve three purposes: "(1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." *Vicom, Inc. v. Harbridge Merchant Servs.,* 20 F.3d 771, 777 (7th Cir.1994). Accordingly, allegations of fraud should report "the who, what, when, where, and how" of the misrepresentation. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

■ Although the complaint does not always distinguish between defendants as precisely as it could have, *e.g.,* Compl. ¶ 24 (referring broadly to "[o]ne or more Defendants"), we think that the allegations sufficiently spell out the fraud. Principally, the fraudulent scheme comprised inducing Venzor to drop the state court lawsuit against Chavez and to pay King Productions, Chavez, and Houk in exchange for Chavez's release to fight a phony match. The scheme to defraud began with the February 1995 fax from King Productions, in which King represented that

he would release Chavez for one fight if Venzor dropped the suit. Compl. ¶¶ 10, 24(a). King then furthered the scheme by insisting that Houk serve as the opponent and by misrepresenting that Houk would put up a good fight, *id.* ¶¶ 11, 16, 18, when in fact King and Braverman (acting on King Productions' behalf) paid Houk to lose. And by the time Houk accepted the bribe, all of the defendants agreed that Houk would throw the fight, *id.* ¶ 17, including Chavez, who trained apathetically for the fight because victory was predetermined, *id.* ¶ 19. The fight itself provided the final touch, as Houk and Chavez feigned a serious match. *Id.* ¶¶ 21, 23. In sum, the defendants' respective roles and misrepresentations in the fraudulent scheme are sufficiently alleged to satisfy Rule 9(b).[1]

### B. Pattern of Racketeering Activity

Next, the defendants challenge the complaint's assertion, *Compl.* ¶ 24(a)–(j), that the following acts constitute a "pattern" of racketeering activity under RICO:

(a) On February 21, 1995, sending the fax transmission referenced in paragraph 10 *supra* in violation of 18 U.S.C. § 1343.

(b) On April 25, 1995, sending the fax transmission referenced in paragraph 13 *supra* in violation of 18 U.S.C. § 1343.

(c) On May 11, 1995, sending the fax transmission referenced in paragraph 14 *supra* in violation of 18 U.S.C. § 1343.

(d) On June 28, 1995, sending the fax transmission referenced in paragraph 15 *supra* in violation of 18 U.S.C. § 1343.

(e) Sending the fax transmission [Chavez to Venzor] and making the phone call

[King to Venzor] referenced in paragraph 16 *supra* in violation of 18 U.S.C. § 1343.

(f) Making the telephone call [Braverman to Houk] referenced in paragraph 17 *supra* in violation of 18 U.S.C. § 1343.

(g) On July 17, 1995, sending a fax transmission to Plaintiff or his counsel regarding the subject fight in violation of 18 U.S.C. § 1343....

(h) Carrying into effect, attempting to carry into effect, conspiring with other persons to carry into effect a scheme in commerce to influence, in any way, by bribery a sporting contest, with knowledge that the purpose of such scheme is to influence by bribery that contest [January 1994 Taylor–Houk fight] as referenced in paragraph 12a *supra* in violation of 18 U.S.C. § 224.

(i) Carrying into effect, attempting to carry into effect, conspiring with other persons to carry into effect a scheme in commerce to influence, in any way, by bribery a sporting contest, with knowledge that the purpose of such scheme is to influence by bribery that contest [September 1994 Murray–Houk fight] as referenced in paragraph 12b *supra* in violation of 18 U.S.C. § 224.

(j) Carrying into effect, attempting to carry into effect, conspiring with other persons to carry into effect a scheme in commerce to influence, in any way, by bribery a sporting contest, with knowledge that the purpose of such scheme is to influence by bribery that contest [July 1995 Chavez–Houk fight] as referenced in paragraphs 17 and 21 *supra* in violation of 18 U.S.C. § 224.

---

1. We point out that King Productions' criticisms of the numerous wire fraud allegations, which are premised on the faxes and phone calls that produced the settlement agreement and that hammered out the fight's details, miss their mark and are actually aimed more at the broad sweep of the wire fraud statute, 18 U.S.C. § 1343. Section 1343 requires only a (1) scheme to defraud and (2) use of the wires for the purpose of executing the scheme. *United States v. Lindemann,* 85 F.3d 1232, 1240–41 (7th Cir.1996); *see United States v. Koen,* 982 F.2d 1101, 1106–07 (7th Cir.1992). "Use" does not require personal use of the wires; if one acts with the knowledge (or it is reasonably foreseeable) that such use will follow in the ordinary course of business, then

the defendant has used the wires. *Koen,* 982 F.2d at 1106–07. Furthermore, the wires are used for the purpose of executing the scheme when the use was "in furtherance" of the scheme, that is, incident to an essential part of the scheme. *Id.* The complaint identifies the initial February 1995 fax as fraudulent, *id.* ¶ 24(a), and alleges that King and King Productions misrepresented Houk as a serious competitor on April 20. Thus, the scheme to defraud was hatched by February, and at the least prior to the subsequent faxes and calls alleged in Compl. ¶¶ 24(b)–(g), which were all incident to inducing Venzor to drop the suit and to pay for a fixed fight, and to setting up that fight.

Compl. ¶ 24(a)–(j). While RICO's provisions provide scant guidance in giving meaning to "pattern of racketeering activity," the Supreme Court, in *H.J. Inc. v. Northwestern Bell T. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), instructed that "to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are *related*, [and] that they amount to or pose a threat of *continued* criminal activity." *Id.* at 239, 109 S.Ct. at 2900 (emphases added). We think the plaintiff's allegations of racketeering activity meet this "continuity plus relationship" test.

 Criminal acts are related if they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)); *see also United States v. Maloney*, 71 F.3d 645, 661 (7th Cir.1995). In the instant case, the alleged wire fraud violations all promoted the same purpose against the same victim: to induce Venzor to drop the suit and pay King Productions, Chavez, and Houk in exchange for a phony fight. In addition, the bribery of Houk related directly to the scheme against Venzor. Furthermore, the Taylor–Houk and Murray–Houk fight schemes in which bribes were offered by King Productions, King, and Braverman and received by Houk involved the same core participants as the scheme against Venzor. Indeed, the Taylor–Houk fight scheme promoted Chavez's challenger in order to heighten the level of interest in an upcoming Taylor–Chavez fight. Based on the complaint's allegations, the predicate acts are sufficiently interrelated to meet the "relationship" element of a RICO "pattern."

 The predicate acts also meet the "continuity" element of a RICO "pattern," although the question is close. Again, *H.J. Inc.* provides the general principle:

> Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.

492 U.S. at 241, 109 S.Ct. at 2902. We conclude that the plaintiff's allegations could support a finding of either a closed-ended or open-ended scheme, and at the motion to dismiss stage of litigation, that is all that is required. Closed-ended continuity is shown "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. Although there is no *per se* minimum duration requirement in the Seventh Circuit, a time period of less than nine months will not likely constitute a "substantial" period of time. *Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 780 (7th Cir.1994). In addition to the length of time, which is the "single most important aspect" of the analysis, *id.* at 781, we examine other factors, including the number and variety of predicate acts, the number of victims, the infliction of distinct injuries, and the existence of separate schemes, *id.* at 780 (citing *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986)).

In this case, the predicate acts started, at the latest, in late January 1994 and continued through late July 1995, a period of at least 18 months. This is not to say that the defendants committed predicate acts in every month during that 18–month period; however, when viewed in light of the nature of the schemes—fixing boxing matches—a factfinder need not deem the frequency of the predicate acts too sporadic under RICO. Moreover, although we discount the numerosity of the wire fraud allegations in this continuity analysis, *Vicom, Inc.*, 20 F.3d at 781, the other factors suggest that the allegations, if proven, would support a finding of closed-ended continuity. Specifically, the number and variety of the predicate acts involved in setting up the three separate schemes, that is, the three fraudulent matches, and the number of spectators who allegedly paid to see fake fights, as well as Venzor's damages as a promoter of the Chavez–Houk fight, weigh in favor of holding that closed-ended continuity has been adequately alleged.

 Furthermore, the allegations arguably support an alternative finding of an open-ended pattern of racketeering activity. Generally stated, open-ended continuity refers "to past conduct that by its nature projects into the future with a threat of repeti-

tion." *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902.

> Open-ended continuity is present when (1) "a specific threat of repetition" exists, (2) "the predicates are a regular way of conducting [an] ongoing legitimate business," or (3) "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."

*Vicom, Inc.*, 20 F.3d at 782 (quoting *H.J. Inc.*, 492 U.S. at 242–43, 109 S.Ct. at 2902–03). In the instant case, the complaint sufficiently alleges that the threat of continued criminal activity is manifested by the second form of open-ended continuity, that is, the predicate acts are a "regular way of conducting" King Productions' business: when King Productions needs a win for one of its boxers, Houk is regularly bribed to intentionally lose. We emphasize, however, that at this pleading stage of the litigation, we only review the complaint for legal sufficiency, and in so doing, we are confined to its allegations. For now, we hold that the allegations in Venzor's complaint state a pattern of racketeering activity.[2]

### C. Injury

■■■■ The defendants also argue that Venzor has failed to allege compensable injuries under RICO. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" may sue and recover damages. In order to recover damages, the RICO violation must have proximately caused the damages. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 1317–18, 117 L.Ed.2d 532 (1992). Here, the plaintiff alleges that the defendants' scheme caused him to drop the original lawsuit against Chavez, which presumably had some monetary value. Compl. ¶ 24. In addition, the plaintiff alleges that the defendants "deprive[d] the Plaintiff of hundreds of thousands of dollars," *id.* ¶ 24, presumably including the payments made to the defendants for a sham fight and for any liability the plaintiff may have to disappointed ticket buyers. Significantly, Venzor *expressly* alleges that he suffered injury to his business and property as a "proximate result" of each RICO violation. *Id.*, Count I ¶ 28 (§ 1962(a)), Count II ¶ 28 (§ 1962(b)), Count III ¶ 28 (§ 1962(c)), Count IV ¶ 31 (§ 1962(d) conspiracy "proximately injured" plaintiff). While proving the claims of damages with evidence may be a different matter, these allegations are sufficient to survive a motion to dismiss.[3]

### D. RICO Violations

■■■■ Next, Chavez and Braverman briefly make individual arguments as to why the complaint fails to allege substantive RICO violations against them. However, none of the arguments are persuasive. First, Chavez protests that the complaint conclusorily alleges that Chavez acquired or maintained an interest in King Productions, *see* Compl. Count II ¶ 27 (§ 1962(b)), and that Chavez conducted or participated in the conduct of King Productions, *see* Compl.Count III ¶ 27 (§ 1962(c)). Although Chavez criticizes the allegations as mere factual conclusions, he fails to cite any authority imposing any higher pleading standard. Moreover, the complaint's allegations are consistent with the factual conclusions pleaded, and we thus reject those criticisms as grounds for dismissing those claims as to Chavez.

There exists some authority, however, for Chavez's separate argument that allegations

---

**2.** We recognize that the close questions of closed- and open-ended continuity are even closer with respect to Chavez. While King Productions, King, Braverman, and Houk are alleged to have participated in predicate acts in each of the three fraudulent fights, the complaint is less clear as to Chavez's involvement in the first two fights. However, at this stage of the proceedings, the complaint alleges that Chavez conspired with the other defendants to violate § 1962(b), (c), Compl. ¶¶ 28–30, and it would be consistent with the allegations if Chavez at least agreed to the fraudulent Taylor–Houk fight, which benefitted Chavez by promoting interest in the subsequent Chavez–Taylor fight. We caution, however, that (like any other case) the plaintiff's generalized allegations will not suffice to defeat a properly supported summary judgment motion.

**3.** We remind the plaintiff of his duties when making factual and legal assertions to this court and his adversary, especially as to his express allegations that the § 1962(a) and (b) violations somehow proximately caused injuries to business and property.

of a RICO conspiracy under § 1962(d) require more than mere conclusions. For example, in *Schiffels v. Kemper Fin. Servs.*, 978 F.2d 344, 352 (7th Cir.1992) the Seventh Circuit stated: "Conclusory allegations of 'conspiracy' are not sufficient to state a claim under § 1962(d); rather, [the plaintiff] must allege facts from which one can infer each defendant's agreement to violate § 1962(c)." Even if such a requirement survives *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the complaint here supplies the requisite allegations. According to the complaint, Chavez at the latest entered the conspiracy to fix the fight in early July 1995. We can infer Chavez's agreement with the other defendants from his conduct after early July 1995: improper training, consumption of "deleterious" substances, the bar room brawl, and of course, the feigned fight itself. Compl. ¶ 19.

Lastly, Braverman maintains that the allegations fail to indicate that he agreed to the commission of more than one predicate act. *See Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 961 (7th Cir.1996) (explaining that RICO conspiracy not only requires agreement to violate substantive RICO provision, but also an agreement to the commission of two or more predicate acts). However, the complaint expressly alleges that Braverman participated in the sports briberies, of Houk for three different fights, and that Braverman committed wire fraud when he phoned Houk in furtherance of the scheme to defraud Venzor. Accordingly, Braverman's arguments are not grounds for dismissing the RICO claims against him.

### E. Promissory Fraud

▮ As for the state law claims, King Productions and King first contend that the fraud claim (Count V) fails to state a claim because the alleged misrepresentation is simply one of opinion, and that the plaintiff fails to allege reliance. Generally, promises to perform future conduct do not constitute fraudulent misrepresentations. *Industrial Specialty Chemicals, Inc. v. Cummins Engine Co.*, 902 F.Supp. 805, 813 (N.D.Ill.1995) (citing *HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 29, 545 N.E.2d 672, 682 (1989)). However, the general rule against the viability of "promissory fraud" is subject to an exception " 'where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud.' " *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir.1992) (quoting *Steinberg v. Chicago Medical Sch.*, 69 Ill.2d 320, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977)). Specifically, the "scheme exception" applies where the party promises performance in order to induce the other party's reliance, and the other party so relies, but the promisor never intended to keep the promise. *Id.*[4]

Venzor sufficiently alleges that, in April 1995, King Productions and King misrepresented that Houk would provide a competitive fight against Chavez, Compl., Count V ¶ 24, and that the plaintiff relied on that misrepresentation, *id.* ¶ 25. For purposes of this motion to dismiss, it matters not that the plaintiff might have doubted Houk's competitiveness against Chavez, or that the plaintiff would have preferred another boxer; the point is that the defendants, by representing that Houk would be competitive, *mis* represented that Houk would not throw the fight. In addition, if the plaintiff had known about the bribe, he presumably would not have promoted and staged the match, and thus he has successfully alleged reliance. In sum, the allegations of Count V state a claim for fraud.

### F. Breach of Contract

Count VI of the complaint purports to state a claim against Chavez for breach of

---

4. This "broad" exception is itself, however, tempered by pleading and proof hurdles under Illinois law. *Bower*, 978 F.2d at 1011. At the pleading stage,

> a claimant must be able to point to specific, objective manifestations of fraudulent intent— a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial

entitling him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid.

*Id.* at 1012 (quoting *Hollymatic Corp. v. Holly Sys.*, 620 F.Supp. 1366, 1369 (N.D.Ill.1985)).

contract. In Venzor's response brief, the plaintiff states that he withdraws the breach of contract claim. Accordingly, Chavez's motion to dismiss this count is granted.

### G. *Illinois Professional Boxing and Wrestling Act*

■ Finally, the defendants contend that Count VII, premised on the Illinois Professional Boxing and Wrestling Act, 225 ILCS 105/1–26, fails to state a claim because there exists no private cause of action under the Act. According to the plaintiff, although the Act admittedly does not provide for an express cause of action, an implied cause of action exists. We agree.

■ Illinois courts "have continually demonstrated a willingness to imply a private remedy [ ] where there exists a clear need to effectuate the purpose of an act." *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill.2d 379, 59 Ill.Dec. 905, 909, 432 N.E.2d 849, 853 (1982). Under Illinois law,

> [i]mplication of a private right of action is appropriate only if: (1) plaintiff is a member of the class for whose benefit the Act was enacted; (2) it is consistent with the underlying purpose of the Act; (3) plaintiff's injury is one the Act was designed to prevent; and (4) it is necessary to provide an adequate remedy for violations of the Act.

*Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill. Dec. 489, 496, 574 N.E.2d 602, 609 (1991); *see also Sawyer Realty Group*, 59 Ill.Dec. at 909, 432 N.E.2d at 853. In *Corgan*, the Illinois Supreme Court implied a private cause of action from the Psychologist Registration Act, which required persons rendering psychological services to possess a certificate issued by the Department of Professional Regulation. The state high court relied on the similarities between the psychologist licensing regime and the statutes governing real estate broker licenses in *Sawyer Realty Group*. Among other things, both acts were "comprehensive licensing and registration schemes designed to protect the public," both set qualification standards for registration certificates, and both empowered the Department of Professional Regulation to enforce the standards.

*Corgan*, 158 Ill.Dec. at 497, 574 N.E.2d at 610.

Similarly, the Professional Boxing and Wrestling Act requires that, "[i]n order to participate in boxing contests," promoters, contestants, trainers (or "seconds"), referees, judges, managers, and timekeepers must obtain a license from the Department of Professional Regulation. 105/10(a)–(h). Promoters and contestants must, *inter alia*, "be of good moral character" and must be free from a current violation of any law or rule governing boxing. 105/11(A), (B). In addition, the Act provides for disciplinary sanctions, including revocation of licenses, for engaging in specified prohibited conduct. 105/16. For example, the plaintiff here alleges that the defendants engaged in such conduct by "[p]articipating in or permitting a sham or fake boxing match," 105/16(2), and by "[e]ngaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public, or which is detrimental to honestly conducted athletic events," 105/16(10).

In light of the four-factor test employed in Illinois, and the similar licensing schemes in *Sawyer Realty Group* and *Corgan*, we hold that there likewise exists an implied cause of action under the Act. First, the provisions specifying the sort of conduct that would subject a licensee (or an applicant for a license) to disciplinary action indicate that Venzor is a member of the class of persons that the Act sought to protect; regulated persons seem to be protected from fellow regulated persons. *E.g.*, 105/16(2), (8)–(10). In addition, although the Act certainly protects spectators of boxing matches, the Act sweeps broader in its protection and imposes duties that go beyond protection of spectators. *E.g.*, 105/13 (promoter must report ticket sales to the Department of Professional Regulation); 105/12 (contestants must be examined by physicians both before and after match). Accordingly, promoters appear to fall within the Act's protected classes.

Moreover, an implied cause of action is consistent with the Act's underlying purpose, which includes protection of properly licensed promoters as well as spectators. In-

deed, the Act provides for civil monetary penalties upon the issuance of a cease and desist order by the Department of Professional Regulation, 105/21, and thus a private cause of action for monetary damages will not frustrate the Act. *See Sawyer Realty Group*, 59 Ill.Dec. at 910, 432 N.E.2d at 854 (existence of limited civil remedies under statutory provisions does not necessarily require rejection of implied cause of action). The third requirement for implication of a private cause of action is also satisfied; given the purposes of the Act, the statutory scheme seeks to prevent Venzor's injuries, including the payments made for a fixed fight, which were caused by the defendants' "sham" boxing match and "dishonorable" conduct. 105/16(2), (10).

 Finally, just as an implied cause of action was "necessary to provide an adequate remedy for violations" of the licensing regimes governing real estate brokers, *Sawyer Realty Group*, 59 Ill.Dec. at 910–11, 432 N.E.2d at 854–55, and psychologists, *Corgan*, 158 Ill.Dec. at 497, 574 N.E.2d at 610, an implied cause of action provides an adequate remedy for the Professional Boxing and Wrestling Act. The limited monetary recovery available to injured parties and the injunctive relief authorized under the Act, *see* 105/21 ($10,000 maximum civil penalty may be imposed if Department of Professional Regulation issues cease and desist order), will unlikely make whole those promoters who unwittingly pay for, and are victimized by, sham fights. *Cf. Sawyer Realty Group*, 59 Ill.Dec. at 910, 432 N.E.2d at 854 (even though injunctive relief and recovery from compensation fund expressly available, implied cause of action necessary to provide adequate remedy); *Corgan*, 158 Ill.Dec. at 497, 574 N.E.2d at 610 (insufficient incentive to pursue administrative or criminal proceedings "without a potential for a tangible re-

ward"). Thus, we conclude that there exists an implied cause of action under the Act.[5]

### III. Conclusion

For the reasons discussed above, we grant Chavez's motion to dismiss the plaintiff's breach of contract claim (Count VI), but otherwise deny the defendants' motions to dismiss. It is so ordered.

---

**5.** We reject the defendants' arguments that, even if an implied cause of action exists under the Act, the plaintiff's suit is premature because he must first exhaust administrative remedies. First, the defendants point to two sections of the Act, 105/5 and 21, as the provisions under which the plaintiff should have first proceeded. However, neither section authorizes a private person to formally initiate a disciplinary hearing or file an administrative complaint. Alternatively, because an implied cause of action necessarily involves inadequate administrative remedies, we would not require exhaustion of such remedies even if some administrative route were open to the plaintiff. *Cf. Yakin v. University of Illinois*, 508 F.Supp. 848, 853 (N.D.Ill.1981), *aff'd*, 760 F.2d 270 (7th Cir.1985) (unpublished order).